# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-4079/99-3554

_____

| | | |
|---|---|---|
| Williston Basin Interstate Pipeline Company, | * | |
| | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | |
| | * | On Petition for Review of |
| Federal Energy Regulatory Commission, | * | Orders of the Federal |
| | * | Energy Regulatory Commission. |
| | * | |
| Respondent; | * | |
| | * | |
| Northern States Power Company, | * | |
| | * | |
| Intervenor on Appeal. | * | |

_____

Submitted: March 15, 2000

Filed: June 27, 2000

_____

Before RICHARD S. ARNOLD, LAY, and BEAM, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Williston Basin Interstate Pipeline Company petitions for review of six administrative orders issued by the Federal Energy Regulatory Commission. All six orders interpret a contract between Williston Basin and the Northern States Power Company. We hold that the Federal Energy Regulatory Commission correctly

interpreted the contract, and therefore affirm the first four orders. We hold that we do not have jurisdiction to review the final two orders, but this holding has no practical significance, since we are deciding the underlying substantive question, the meaning of the contract.

I.

Williston Basin Interstate Pipeline Company is an interstate natural gas pipeline company that operates in Montana, North Dakota, South Dakota, and Wyoming. Northern States Power Company supplies residential and commercial customers in North Dakota and Minnesota with natural gas. In 1991, Northern States and Williston entered into negotiations for Williston to build a 50-mile addition to Williston's pipeline system that would allow it to transport natural gas for Northern States.

Pursuant to Section 7(c) of the Natural Gas Act, 15 U.S.C. §717f(c), Williston filed an application with the Federal Energy Regulatory Commission, requesting a certificate of public convenience and necessity to construct the pipeline and transport the natural gas. As part of the application, Williston included a proposed new tariff to cover this service. Williston generally uses what is referred to as the "FT-1" rate schedule. The proposed tariff for the Williston-Northern States deal was called Rate Schedule X-13. The Commission issued a certificate authorizing Williston to construct and operate the pipeline and related facilities to transport gas for Northern States. However, the Commission directed that some changes be made to Rate Schedule X-13. The Commission required Williston to recover the costs of the new service through an "incremental rate."[1]

---

[1]Additionally, the Commission set the initial rate, contained in Rate Schedule X-13, at $19.5778 per 1,000 cubic feet of gas.

In response to the Commission's directive to use an incremental rate, Williston and Northern States submitted a Service Agreement. Article V of this Service Agreement requires Williston to recalculate ("restate") the X-13 rate on March 1, 1995, and to continue its recalculations every two years until the X-13 rate equals or falls below Williston's generally available FT-1 rate. The agreement states that these rate restatements are "pursuant to Section 4 of the Natural Gas Act." When the X-13 rate equals or falls below the FT-1 rate, Northern States will pay a rate equal to the FT-1 rate, and the X-13 rate will no longer be restated. Exhibit A and Schedule A of the Service Agreement also provide that in calculating and restating the X-13 rate, Williston will use two cost components – the return-on-equity and depreciation rates – that it uses in calculating its FT-1 Rate Schedule. The contract states that in using these FT-1 cost components, Williston will use Rate Schedule FT-1 "as such may be in effect from time to time."

A brief discussion of the Commission's role under the Natural Gas Act will be useful in explaining Williston's and Northern States' problems under this contract. Under Section 4 of the Natural Gas Act, 15 U.S.C. §717c, if a pipeline such as Williston proposes to change its existing rates, the pipeline has the burden of demonstrating to the Commission that its proposed change is just and reasonable. If the pipeline proposes a rate increase, the Commission can allow the pipeline to put its new rate into effect (making it the "effective" rate), but subject to investigation and refund. This means that if the Commission ultimately determines that the proposed rate was not just and reasonable, the Commission can order the pipeline to refund the difference between the "effective" rate and the rate the Commission ultimately decides is just and reasonable. In contrast, under Section 5 of the Natural Gas Act, 15 US.C. §717d, if the Commission decides to review a pipeline's rates that are already unconditionally in place, it has power to grant only prospective relief.

On March 1, 1995, pursuant to the contract, Williston restated its X-13 rate for the first time. The FT-1 rate used to calculate this restatement (Docket No. 92-163)

was one that had been effective, subject to investigation and refund, since November 1, 1992. The Commission took note of the fact that the return-on-equity and depreciation rates underlying the restated X-13 rate were tied to those underlying the FT-1 rate, which was itself subject to refund. Therefore, the Commission made the X-13 rate also subject to refund pending the outcome of the ongoing rate case in the FT-1 docket. This is the first order that Northern States is challenging here. Williston sought rehearing of this order, arguing that because the restated X-13 rate was lower than the initial X-13 rate, the Commission lacked authority to make the restated rate subject to refund. The Commission denied the request for rehearing, reasoning that because the X-13 rate was not yet final, it was not yet certain that the restated X-13 rate would actually be a decrease. The Commission's denial of rehearing is the second order that Williston is challenging here.

Shortly thereafter, the Commission finished its investigation of the FT-1 rate (Docket No. 92-163) that had been used in calculating Williston's first restatement. The Commission issued orders that, *inter alia*, lowered the return-on-equity and depreciation rates for this FT-1 rate. These orders required Williston to lower this FT-1 rate retroactively for its effective period, which was November 1, 1992 through August 1, 1995.[2] The Commission then directed Williston to recalculate its first restatement of the X-13 rate to reflect the lower return-on-equity and depreciation rates of the underlying FT-1, and to refund the overcharges. The Commission also ordered

---

[2]This action did not yet finalize the FT-1 rate in Docket No. 92-163. Williston challenged this decision in the D.C. Circuit. That Court remanded the order back to the Commission for further consideration of the return-on-equity rate imposed on Williston. Williston Basin Interstate Pipeline v. FERC, 165 F.3d 54, 62-63 (D.C. Cir. 1999). Recently Williston Basin entered into a settlement agreement involving the return-on-equity rate, and this settlement agreement was approved by the Commission. As such, the cost components of the FT-1 rate involved in calculating Williston's 1995 X-13 restatement are now final. The motion of Northern States to file a supplemental appendix containing the settlement agreement is granted.

Williston to follow a similar procedure in its subsequent biennial filings. This is the third order Williston challenges here. Williston sought rehearing of this order, and the Commission's denial of rehearing is the fourth order that Williston now challenges.

This process repeated itself in 1997, when Williston made its second biennial restatement of the X-13 rate. Williston used the FT-1 rate that had become effective on August 1, 1995 (Docket No. 95-364) to calculate this second X-13 restatement rate. The result of Williston's second X-13 restated rate was an overall rate reduction. However, the FT-1 rate that Williston used was itself subject to refund and investigation. Accordingly, the Commission accepted the proposed X-13 rate subject to refund, pending its final determination regarding the FT-1 rate in Docket No. 95-364. This is the fifth order that Williston is challenging before our Court. Williston sought rehearing, again arguing that the Commission lacked authority to make a rate decrease subject to a refund. The Commission's denial of this request for rehearing is the sixth order that Williston now challenges.

## II.

Before we reach the merits, we must address some jurisdictional issues. Initially, the Commission argued that this Court did not have jurisdiction to review any of the six orders, because they were not yet final. The Commission's investigations of both underlying FT-1 rates were still pending. It was not yet certain that Williston would actually be forced to pay any refund. In light of the settlement agreement with respect to the FT-1 rate in Docket No. 92-163,[3] all parties now agree that we have jurisdiction

---

[3]This settlement agreement lowers the return-on-equity rate for the FT-1 rate in Docket No. 92-163. Accordingly, the final X-13 rate for Williston's first restatement will be lower than the initial effective rate, and Williston will have to pay a refund to Northern States.

to review the first four challenged orders.  These orders are final agency action, and are ripe for review before our Court.

However, the underlying FT-1 rate for Williston's second restatement of the X-13 rate is still undetermined pending the result of the Commission's investigation.  We agree with the Commission that we do not have jurisdiction to review the orders that concern the second restated rate.  It is not clear what, if any, refund Williston will be required to pay with regard to the second restatement of the X-13 rate.  These orders are not yet the "final administrative action."  See United States v. Gary, 963 F.2d 180,185 (8th Cir. 1992).[4]

## III.

We now turn to the four orders over which we have jurisdiction.  Although the facts of this case seem complicated, the legal issue is a straightforward contract question.  Did the Commission correctly interpret the contract between Williston and Northern States to require that Williston use the "final" FT-1 cost components in its biennial restatement, as opposed to the "effective" rate at the time of a restatement?

As an initial matter, the parties disagree over what standard of review should apply.   Williston argues that the Commission's decision is not based on an interpretation of a statute, or of regulations or guidelines promulgated by the agency, but only on its reading of a contract.  Therefore, it says the Chevron doctrine, see Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-44 (1984), does not apply, and we should not defer to the Commission's decision.  See

---

[4]In holding that we do not have jurisdiction, we agree with the reasoning of the D.C. Circuit, which also dismissed Williston's petition for review of these two orders. See Williston Basin Interstate Pipeline Co. v. FERC, 1997 WL 811724, No. 97-1504 (D.C. Cir. Dec. 12, 1997).

AMISUB v. Shalala, 12 F.3d 840, 843-4 (8th Cir. 1994). In response, the Commission argues that we should review its decisions under the "arbitrary and capricious" standard, and defer to the Commission's interpretation as long as it is rational. See Minnesota Power & Light Co. v. FERC, 852 F.2d 1070, 1072 (8th Cir. 1988). We do not have to resolve this dispute, because even under the more stringent standard proposed by Williston, we hold that the Commission correctly interpreted the contract.

Schedule A of the agreement expressly sets forth a formula for calculating the rate to be included in each biennial rate restatement. The agreement provides that Williston will calculate the X-13 rate using the depreciation and return-on-equity rates underlying its FT-1 rate "as such may be in effect from time to time." This language is ambiguous, because two different FT-1 rates could be "in effect" for any given period of time. There could be one FT-1 rate which is in effect, subject to refund, on the computation date. Yet when the Commission concludes its investigation, it could set a different FT-1 rate, which is retroactive so as to be effective back to the computation date. That is exactly what happened in this instance. The phrase "as such may be in effect from time to time" does not direct which of those two rates should be used.

The initial "incremental" rate set forth in the contract was expressed in an actual dollar amount. In contrast, the future rate restatements are expressed in a formula that requires change in the future in accordance with changes to certain component elements of the FT-1 rate. However, the FT-1 rate itself can be, and in fact was, subject to refund. If the X-13 rate incorporates by reference the FT-1 rate, logically it also incorporates the refund process to which the FT-1 rate is subject. If future FT-1 rates are subject to refund, than so are the X-13 rates that are based on those FT-1 rates. The final rate, after the refund determination is made, is the "just and reasonable" rate. To interpret the contract otherwise would be to allow Williston to charge Northern States whatever rate had been proposed, regardless of its justness or reasonableness.

The rest of the contract is consistent with this interpretation. In addressing the situation when the X-13 rate no longer exceeds the FT-1 rate, the contract states that the X-13 rate is to be equal to the FT-1 rate "as such may be in effect from time to time." The Commission interpreted this phrase to mean that when the X-13 and FT-1 rates are equal, that any retroactive changes to the FT-1 rate would also affect the X-13 rate, because at that point the X-13 rate has essentially become the FT-1 rate. If this is so, and we agree that it is, it is consistent to interpret the same phrase to have a similar meaning in the disputed portion of the contract. We also believe this interpretation is more consistent with the parties' intentions. In another part of the contract, the parties made the initial X-13 rate subject to the final FT-1 rate. It is reasonable to infer that Williston and Northern States intended a similar outcome for subsequent restatements. Moreover, Exhibit A to Rate Schedule X-13 expressly provides for retroactive increases in the restated X-13 rate. It is unlikely that the parties could have intended anything as one-sided as to provide for retroactive increases in the X-13 rate without providing for a corresponding measure for retroactive rate decreases.

Williston argues that this interpretation of the contract allows the Commission to order a refund for a rate decrease, which would exceed its powers under Section 4 of the Natural Gas Act. We do not believe that this is the case. Under Section 16 of the Natural Gas Act, 15 U.S.C. §717o, the Commission has the authority to enforce the terms of a pipeline's rate schedule. This includes the power to order refunds to enforce the terms of Commission-approved tariffs and contracts. See Consolidated Gas Transmission Corp. v. FERC, 771 F.2d 1536, 1550-51 (D.C. Cir. 1985). That is exactly what the Commission did here.

IV.

Therefore, for the reasons stated above, as to the first four orders that Williston is appealing, we hold that the Commission properly interpreted the contract between

Williston and Northern States. The FT-1 rate that should be used when calculating the 1995 X-13 restatement should be the final FT-1 rate, not the FT-1 rate that was in effect subject to investigation and refund when Williston made its restatement. We dismiss that portion of the appeal dealing with the last two orders, relating to the 1997 X-13 restatement, as we do not have jurisdiction over those orders.

BEAM, Circuit Judge, dissenting.

I agree with the court's opinion except its analysis of the applicable depreciation and rate of return calculations to be applied. In my view, the rates "in effect from time to time," are those being used at the time the biennial rate restatement is initially calculated. Accordingly, I would reverse the Commission in the four orders over which the court has jurisdiction.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.