# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 11, 2008       Decided March 18, 2008

No. 06-1145

WILLISTON BASIN INTERSTATE PIPELINE COMPANY,
PETITIONER

V.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NORTHERN STATES POWER COMPANY (MINNESOTA), ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Robert T. Hall, III*, argued the cause for petitioner. With
him on the briefs was *Andrea Wolfman*.

*Robert B. Nelson*, *Robert A. Jablon*, and *Rebecca
Baldwin* were on the brief for intervenors Montana Consumer
Counsel and South Dakota Public Utilities Commission.

*Carol J. Banta*, Attorney, Federal Energy Regulatory
Commission, argued the cause for respondent. On the brief

were *John S. Moot*, General Counsel, *Robert H. Solomon*, Solicitor, and *Patrick Y. Lee*, Attorney.

*Robert I. White* was on the brief for intervenor Northern States Power Company (Minnesota). *Nancy A. White* entered an appearance.

Before: ROGERS and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:    Williston Basin Interstate Pipeline Company challenges orders of the Federal Energy Regulatory Commission that modified its contract with a shipper, the Northern States Power Company ("NSP"), so that NSP would be able to resell transportation capacity for which it had no use.  While we find that the Commission was correct to decide the case under the "just and reasonable" standard of § 5(a) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717d(a), we grant Williston's petition; flaws in the Commission's reasoning render its orders arbitrary and capricious.

* * *

Williston stores and transports natural gas throughout Montana, North Dakota, South Dakota, and Wyoming. NSP, a natural gas distributor, is one of Williston's customers and operates in North Dakota and Minnesota.  Williston and NSP entered into two contracts under which NSP would receive transportation services from Williston along a pipeline called the Mapleton Extension, which Williston had built under arrangement with NSP to carry gas to an NSP distribution system in eastern North Dakota.  One contract, the "Rate

Schedule X-13 contract," was filed as an individually certified transportation service under Part 157 of the Commission's regulations, 18 C.F.R. Pt. 157. The second contract was for open access service under Williston's Rate Schedule FT-1 under Part 284, 18 C.F.R. Pt. 284. Under Part 284, firm shippers that do not use all of their capacity can "release" the unused portion and enjoy the revenue paid by the replacement shipper, either directly or as a credit to the pipeline's charges. See *id.* § 284.8(a)-(g).

At about the time that Williston and NSP finalized the Rate Schedule X-13 contract, the Commission initiated a rulemaking that would eventually yield Order No. 636. See *Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,* 57 Fed. Reg. 13267 (Apr. 16, 1992). The order, so far as is relevant here, encouraged pipelines and their customers to convert transportation service under Part 157 to open access service under Part 284. While the order offered pipelines inducements to convert, it imposed no mandate to do so. See *United Distribution Cos. v. FERC*, 88 F.3d 1105, 1159 (D.C. Cir. 1996).

In the course of a rate proceeding filed by Williston under NGA § 4, 18 U.S.C. § 717c, the Commission found that Part 157 service under Rate Schedule X-13, without capacity release rights, was no longer just and reasonable, and accordingly granted NSP's request that the service be converted to Part 284. *Williston Basin Interstate Pipeline Co.*, 113 FERC ¶ 61,201 (November 22, 2005) ("Order"). Williston filed for rehearing, arguing principally that (1) NSP's request could be granted only if it satisfied the stricter "public interest" standard rather than merely the "just and reasonable" standard; (2) the Commission's action was an unexplained departure from its longtime policy of making

conversions to open access transportation voluntary; and (3) the Commission ignored the financial impact on Williston and its customers. The Commission denied rehearing. *Williston Basin Interstate Pipeline Co.*, 115 FERC ¶ 61,081 (April 20, 2006) ("Rehearing Order"). Williston petitioned for review under NGA § 19(b), 15 U.S.C. § 717r(b).

\* \* \*

We review the Commission's orders under the arbitrary and capricious standard. 5 U.S.C. § 706(2)(A); see also *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004). That standard requires that the Commission "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The reasoning offered by the Commission falls short.

*The "public interest" standard.* Under the *Mobile-Sierra* doctrine, "where parties have negotiated a natural gas shipment contract that . . . denies either party the right to change [] prices or charges unilaterally, [the Commission] may abrogate or modify the contract only if the public interest so requires." *Texaco Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C. Cir. 1998); see also *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956) (establishing the doctrine for natural gas pipelines); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 354-55 (1956) (same for power transmission facilities). Williston contends that the Commission should have applied that standard. The Commission responds that the contract has a "*Memphis* clause" displacing *Mobile-Sierra*.

The label "*Memphis* clause" derives from the Supreme Court's decision in *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division*, 358 U.S. 103 (1958), holding that a contract provision allowing a party to seek a rate adjustment under a suitable provision of the Natural Gas Act (§ 4 for the utility, § 5 for the customer) obviates the need to apply *Mobile-Sierra*'s "public interest" criterion. The *Memphis* Court could see "no tenable basis of distinction between the filing of [a new rate under § 4 of the NGA] in the absence of a contract and a similar filing under an agreement which explicitly permits it." *Id.* at 112-13. Thus, a *Memphis* clause simply entitles a party to file for changes under an applicable provision of the NGA. See 358 U.S. at 115; see also *id*. at 112, 114.

Here the contract, after providing that Williston could apply to the Commission to make changes under § 4 of the NGA, made a parallel provision for NSP, saying that the agreement should not be construed as "in any way" affecting NSP's rights "to intervene, protest or otherwise participate in such proceedings or to seek to initiate proceedings under Section 5 of the Natural Gas Act, other provisions thereof, or the FERC's rules and regulations thereunder, or any other applicable statute(s)." Williston Basin Interstate Pipeline Company FERC Gas Tariff, Rate Schedule X-13, art. IX, Ex. NSP-3 at 16, Joint Appendix ("J.A.") 253.

Williston argues that while the provision here empowers NSP to initiate proceedings under § 5 of the Natural Gas Act, it fails to specify a controlling standard (and thus leaves *Mobile-Sierra*'s "public interest" standard in place). But *Mobile-Sierra* always leaves parties free to seek change under its stringent standard. Thus, as we said in the case of a contract similar to the one at issue here, which permitted filings with the Commission but failed to specify a standard, "specific acknowledgment of the possibility of future rate

change is virtually meaningless unless it envisions a just-and-reasonable standard." *Papago Tribal Utility Auth. v. FERC*, 723 F.2d 950, 954 (D.C. Cir. 1983); see also Rehearing Order, 115 FERC ¶ 61,081 at 61,273 P 14 (noting that Williston's reading would render the clause "useless surplusage"). Indeed, the clause at issue in *Memphis* itself made no mention of the applicable standard, saying merely that gas was to be delivered under the seller's rate schedule "or any effective superseding rate schedules, on file with the Federal Power Commission." 358 U.S. at 105 (italics omitted); see also *id*. at 114-15.

Williston next contends that the Commission was required to apply the "public interest" test because the Commission "did not merely adjust the rate or a term of the service, it invalidated the contract and ordered [Williston] to enter into a new and entirely different kind of contract and service with NSP." Petitioner's Br. 18. In support, Williston relies on our decision in *ExxonMobil Corp. v. FERC*, 430 F.3d 1166 (D.C. Cir. 2005), where we accepted (as neither arbitrary or capricious) the Commission's finding that, despite the presence of a *Memphis* clause, it could not apply the just and reasonable standard to a pipeline's proposal to shift certain shippers from interruptible to firm service, a shift that would have required them to pay a reservation charge. The Commission explained that the pipeline's plan would effectively have required "the customer to take and pay for additional service for which the customer has not contracted." *Transco. Gas Pipe Line Corp.*, 107 FERC ¶ 61,156 at 61,508 P 17 (2004). We regarded the Commission's conclusion as within its discretion. *ExxonMobil*, 430 F.3d at 1173. But whereas in *ExxonMobil* the proposed change would have imposed the risk of pipeline underuse on customers not hitherto bearing that risk, here the shift ordered by FERC merely denies the adversely affected party (the pipeline) the opportunity (or part of the opportunity) to garner additional

revenue from replacement shippers. Although the Commission may have walked a fine line, it is not one that we could call arbitrary or capricious. Accordingly, we reject Williston's contention that the Commission erred in relying on the just and reasonable standard of § 5.

*Application of the just and reasonable standard.* Under § 5's "just and reasonable" standard the Commission bears the burden of demonstrating that the current rate is unjust and unreasonable and that the replacement rate is just and reasonable. See *Municipal Def. Group v. FERC*, 170 F.3d 197, 201 (D.C. Cir. 1999); *Consolidated Edison Co. v. FERC*, 165 F.3d 992, 1000-01 (D.C. Cir. 1999). The Commission has somewhat mischaracterized the issue at a number of places in its orders and brief. In the Rehearing Order, for example, it said, "What is unduly preferential and unreasonable is for Williston to garner revenues from the sale of the capacity NSP has paid for." 115 FERC at 61,280 P 42. In one sense, to be sure, Williston has been "garner[ing] revenues from the sale of the capacity NSP has paid for"; NSP indeed is paying for specified capacity, at rates calculated to cover Williston's costs. But NSP engaged the capacity under Part 157, which allowed Williston, *not* NSP, the right to resell unused capacity. Thus the contract favors Williston's position, not NSP's, contrary to the Commission's rhetoric.

Second, the Commission seems confused about the relationship between its authority and its obligation to explain its policy. It declared in the Rehearing Order that "it is illogical [for Williston to argue] that the Commission has the authority to order the conversion, but that it must justify its exercise of that authority as a 'new policy.'" *Id.* at 61,276 P 26; see also Respondent's Br. at 28-29. Regardless of whether the Commission's policy is new (a matter we take up below), a party is perfectly consistent in its reasoning when it recognizes the Commission's authority, yet demands that the

Commission articulate the policy well enough so that parties (and courts) can understand how it arrived at its result. That proposition is almost universally true, but is especially true here, where (1) the Commission's leading statement of relevant policy, Order No. 636, deliberately refrained from imposing the mandate that it has imposed here, and (2) it is undisputed that this is the first instance in which the Commission has imposed such a mandate. See Rehearing Order, 115 FERC 61,275-76 at P 25 (acknowledging that the orders here are such a first).

In its request for rehearing, Williston challenged the Commission to state what it regarded as the "appropriate conditions" for moving from simply "favoring" shippers' entitlement to capacity release rights to mandating such rights. The Commission picked up the gauntlet:

> Quite simply, [the appropriate] conditions were: [1] the history of Williston's aggressive interpretation of Rate Schedule X-13, reflected in its mispricing of the rates thereunder, [2] the unique fact of its affiliation with its largest customer and the protection from transmission competition [that] the vestigial X-13 arrangement offered these entities, [3] the impairment of market health resulting from this diminution of competition, and [4] the rejection by the transporter of alternatives offered at hearing for transitioning to open-access service from X-13, which was the culmination of many years of rebuffing the shipper's request to negotiate such a transition. [5] Since these elements in the aggregate evidenced obstruction of the Commission's policy favoring open-access use of capacity by those who pay for it, the appropriate conditions were presented for the Commission to act in furtherance of that pro-competitive goal. Accordingly, rehearing on the issue of conversion of the X-13 service is denied.

*Id*. at 61,280 P 45.

Points 1, 4 and 5 appear irrelevant. Point 1 seems to suggest that Williston's choice to litigate an adverse Commission rate ruling somehow disentitles it to have its position here examined on the merits. (We note that Williston picked up a dissent in the litigation, *Williston Basin Interstate Pipeline Co. v. FERC*, 215 F.3d 875, 880 (8th Cir. 2000), which makes the Commission's use of this red herring all the more odd.) Point 4 (which is echoed in Point 5) seems, in effect, to blame Williston for insisting on retaining the rights that the Commission itself established under Part 157 and left in place in Order No. 636. But a party's resistance to an order can hardly constitute affirmative grounds for issuing the order; an agency's loose claim of lèse majesté is not a substitute for policy analysis. And Point 5 (insofar as it goes beyond Point 4) repeats the Commission's oversimplifying remark that NSP has already paid for the capacity. True, but its contract gave Williston the rights over unused capacity, and the Commission formerly found that arrangement, and Part 157 arrangements generally, just and reasonable.

This leaves Point 2, the fact that Williston's largest customer is its affiliate, and Point 3, the enhancement to competition that would flow from shippers' enjoying capacity release. We take the affiliation to be relevant because, even in a world of general open access, the affiliate would not compete with Williston in the resale of unused pipeline capacity. At the margin, that presumably enhances the argument for shifting NSP to open access, as it means that the competitive capacity resale market is smaller than one would otherwise expect. But while we clearly see that a capacity resale market with an abundance of independent resellers would be more competitive than one dominated by the pipeline, this was surely just as true when the Commission adopted its general policy of *not* forcing conversion.

Similarly, while the Commission consistently viewed enhanced competition as a generic reason for a preference for capacity release (since the policy's adoption), it has never hitherto found a case that justified ordering a pipeline to convert at the request of a shipper. Because the general policy preference has been a constant, the Commission's failure to identify the special characteristics applicable to Williston, or to explicitly revise its policy, leaves a serious gap in its reasoning.

The Commission decisions offered by Williston fall somewhat short of showing a clear change in policy. We find it hard to discern much of a policy at all. Williston calls our attention to passages in *Transcontinental Gas Pipe Line Corp.*, 106 FERC ¶ 61,299 (2004), in which the Commission rejected an effort of customers to convert certain service to Part 284. *Id*. at 62,109-10 P 34, 62,111-12 P 44. But the case appears distinguishable in that the pipeline offered testimony indicating that the remedy "would compromise [the pipeline's] operation [sic] flexibility and its ability to perform no-notice service in the manner in which it performs such service today." *Id*. at 62,111-12 P 44. If one thought that this established a general principle that the Commission would mandate conversions to Part 284 in the absence of operational problems, one would be wrong. Elsewhere in the decision, the Commission rejected such a mandate, even while noting (and not refuting) the customers' argument that the pipeline had failed to show operational problems. Instead, it relied heavily on exactly the point that Williston stressed here—that in Order No. 636 the Commission had rejected the idea of entitling Part 157 customers to receive capacity release rights. *Id.* at 62,112-13 PP 49-53.

Williston cites *Marathon Oil Co. v. Trailblazer Pipeline Co.*, 111 FERC ¶ 61,236 (2005), for a more general proposition—the Commission's stated reluctance to override

contracts even where *Mobile-Sierra* is inapplicable and a party proposes action under § 5:

> Absent a compelling reason, the Commission does not believe it should second-guess the business and economic decisions between knowledgeable business entities when they enter into negotiated rate contracts. Pipelines rely on their contracts and the integrity of the Commission's process in deciding whether to construct new facilities. As such, the Commission is reluctant to upset the expectations of pipelines when they make investment decisions in reliance on the commitments by their customers and the Commission's approval.

*Id*. at 62,064 P 64. In the Rehearing Order, the Commission responded to the citation by saying that here the facts presented a "compelling reason," 115 FERC at 61,276-77 P 29, but the only reason yet revealed is the ubiquitous interest in enhancing competition. Moreover, as Williston notes without dispute from the Commission, it built the Mapleton Extension in reliance on its contracts with NSP, reliance seemingly indistinguishable from the reliance the Commission invoked in *Marathon* for refusing to alter the contract.

In short, however one characterizes prior policy, we do not think the Commission has yet articulated a "rational connection between the facts found and the choice made," as required by *State Farm*, 463 U.S. at 43.

Williston also argued that the order would be quite costly for Williston and its customers. As to the customers, the Commission said that until Williston filed a new rate case there would be no effect on customers, see Order, 113 FERC ¶ 61,201 at 61,833 P 57. This is typically true, of course, but is hardly a reason for refusing to anticipate looming developments.

As to the immediate impact on Williston, the Commission said that conversion to open-access service would yield a gain of approximately $402,000 to $695,000 per year for NSP and a loss of only about $50,000 for Williston (which it viewed as trivial). See Rehearing Order, 115 FERC at 61,278 P 35. The Commission nowhere attempts to reconcile these numbers. While there may be an implication that NSP will reap more benefits than Williston would lose because NSP will be a more aggressive marketer of the capacity, the Commission doesn't say so. Nor does it say that Williston has been deceptively hiding resale revenues.

Williston offered an explanation—in effect that the Commission was comparing apples to oranges: a comparison of NSP's gains from resale rights throughout Williston's pipeline system with Williston's losses from NSP's flexibility on the Mapleton Extension only. In fact, as the administrative law judge noted, a witness for Williston testified that the $50,000 estimate depends only on the Mapleton Extension. See *Williston Basin Interstate Pipeline Co.*, 111 FERC ¶ 63,007 at 65,033 P 108 (2005).

The Commission has responded to this confusion (both on rehearing and at oral argument) by reverting to its mantra that the entitlement was in any event NSP's: "[E]ven in the unlikely event Williston's estimates prove true, it is the shipper and its customer who should receive the revenues, since they are paying for the capacity." Rehearing Order, 115 FERC at 61,278 P 35 n.58. This argument is no more effective here than in its other incarnations. See p. 7 supra.

To the extent that a mandated change would adversely affect shippers, another Williston argument may be relevant. Williston points to documents that it says indicate that it and NSP shared the understanding that Williston's existing shippers would not bear the costs of building the extension,

Ex. WBIP-1 at 4, J.A. 299; Ex. WBIP-10, J.A. 301, and Ex. WBIP-11, J.A. 309, and indeed that Williston would benefit from any capacity that NSP was not fully using, as of course Part 157 allowed. In the present confusion on the cost shift data, we take no position on these claims.

Finally, the Commission in one passage seems to invoke the notion that "other cost reductions" may offset the "reallocation of the Rate Schedule X-13 costs." Rehearing Order, 115 FERC at 61,279 P 38. But unless the Commission's edict somehow *enabled* such cost reductions, the prospect seems quite irrelevant.

The last issue is Williston's argument that the Commission erroneously decided to continue NSP's right to exercise a right to biennial rate adjustments established by the Rate Schedule X-13 contract; Williston says this denial gave NSP an undue preference, as its other Part 284 customers (to whom the Commission's orders would assimilate NSP) have no such right. The Commission, rejecting Williston's claim, explained that "[its] intent was to preserve as much of the parties' original agreement as possible, while according NSP the ability to release capacity and other features of Part 284 service that are accorded FT shippers." *Id.* at 61,280 P 43 The Commission also said that "it is reasonable … to maintain the biennial restatement process, because the X-13 rate always was intended to converge with the FT-1 rate." *Id.* at 61,278 P 35.

Of course, the Commission, if it had wished, could have preserved the entire agreement between Williston and NSP, so its sudden effort to wrap itself in the sacred character of contracts sounds a bit lame. In reality the Commission seems to be saying that it wants to preserve as much of the parties' original agreement as possible, *subject to its greater desire to shift the capacity release revenues to NSP.* It may be that the

Commission's decision can rest exclusively on the "convergence" argument alluded to just above, but the Commission never developed the point, and in any event, when an agency relies on two theories, one of them unsound, we usually remand unless we are quite sure that the agency regards the remaining reason as sufficient. See *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).

* * *

Because there seems to be a significant possibility that the Commission may find an adequate explanation for its actions, and, in any event, it appears that the consequences of its current ruling can be unraveled if it fails to, see *Allied-Signal v. United States Nuclear Regulatory Comm'n.*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), we remand the case to the Commission but do not vacate the orders.

*So ordered.*