# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 24, 2023　　　　　Decided July 14, 2023

No. 22-1096

XO ENERGY MA, LP AND XO ENERGY LLC,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MONITORING ANALYTICS, LLC,
INTERVENOR

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Peter B. Siegal* argued the cause and filed the briefs for petitioners.

*Matthew J. Glover*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Jeffrey Whitefield Mayes* argued the cause for intervenor for respondent Independent Market Monitor for PJM (Monitoring Analytics, LLC).

Before: CHILDS and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* ROGERS.

ROGERS, *Senior Circuit Judge*: XO Energy petitions for review of the Federal Energy Regulatory Commission's approval of filings implementing a regional transmission organization's ("RTO") revised Forfeiture Rule for Financial Transmission Rights ("FTRs"). It contends that the Commission erred as a matter of law in declining to issue refunds to market participants who incurred forfeitures under the unapproved interim Rule. It further contends that the Commission's approval of the revised 2021 Rule was arbitrary and capricious because the Rule captures competitive transactions and burdens legitimate hedging activities in ways that do not deter potentially manipulative transactions. Specifically, according to XO Energy, the Commission erred by failing to require that the RTO consider traders' entire FTR portfolios and whether a transaction is "leveraged," that is, whether it creates net profit for the FTR holder. For the following reasons, the court affirms the Commission's orders denying refunds and remands for further explanation of the Commission's decision to exclude consideration of "leverage" as a required element of the Rule.

**I.**

Section 205(a) of the Federal Power Act mandates that "[a]ll rates and charges" within the Commission's jurisdiction,

as well as "all rules and regulations" pertaining to those rates and charges, be "just and reasonable." 16 U.S.C. § 824d(a); *see also Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 68 (D.C. Cir. 1992). Section 205(c) of the Act requires regulated utilities to file with the Commission all jurisdictional rates and charges, as well as the practices affecting such rates and charges. 16 U.S.C. § 824d(c). Section 206 of the Act, in turn, requires the Commission to ensure that any rates charged are just and reasonable. *Id.* § 824e.

One way the Commission ensures that these filed rates are compliant is by guarding against sellers' abuse of market power. *See Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1183–84 (D.C. Cir. 2021). In so doing, the Commission can initiate enforcement proceedings either unilaterally or upon a complaint from a third party. 16 U.S.C. § 824e(a). If the Commission finds that any rate demanded by a utility within its jurisdiction is "unjust, unreasonable, unduly discriminatory or preferential," the Commission must set aside that rate and impose its own just and reasonable rate. *Id.* The burden of proof lies with the party initiating the proceeding. *Id.* § 824e(b).

## A.

PJM Interconnection, L.L.C. ("PJM") is an RTO that exercises operational control over all transmission facilities located within its region, spanning thirteen states and the District of Columbia. *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 110–11 (D.C. Cir. 2017). In addition to coordinating transmission service, RTOs run auction markets for electricity and capacity sales. *Morgan Stanley Cap. Grp. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 537 (2008). Because these auctions determine the wholesale rates of energy in interstate commerce, they are subject to Commission oversight. *FERC*

4

*v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016); *see* 16 U.S.C. § 824(b)(1).

In the PJM market, electricity is allocated through day-ahead and real-time auctions, which enable suppliers to meet demand from the utilities and other "load-serving entities" that buy power at wholesale for resale to users. *Elec. Power Supply Ass'n*, 577 U.S. at 268. When market participants purchase electricity, they pay a "Locational Marginal Price," which reflects the cost of production and delivery to a particular location on the electrical grid. *See, e.g.*, *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 524–25 (D.C. Cir. 2010). That price includes any costs associated with congestion on the transmission path, which occurs during periods of high demand when the limitations of the grid require electricity to be dispatched through pathways that are more costly. PJM INTERCONNECTION, L.L.C., FTRs: PROTECTION AGAINST CONGESTION CHARGES (2020), https://perma.cc/7VUP-8CEB. Because congestion is unpredictable, PJM allows market participants to hedge congestion risks in its day-ahead market using FTRs, a long-term financial contract that entitles the holder to profit or creates liability based on the hourly day-ahead congestion prices between the starting and ending locations on a transmission path. If the price is higher at the end point than at the source, the FTR is a benefit to the holder; if lower, the FTR is a liability. *See id.*

PJM also offers "virtual" transactions, which allow market participants to buy (or sell) electricity in the day-ahead market, and then sell (or buy) an equal quantity in the real-time market. PJM Interconnection, L.L.C., *Report on the Impact of Virtual Transactions* 1, FERC Docket No. ER13-1654-000 (Feb. 7, 2014). Virtual transactions financially benefit the trader if the price differential between the real-time and day-ahead markets is favorable. *Id.* Because virtual transactions can increase the

amount of congestion in the day-ahead market, they may create the potential for cross-product manipulation by market participants that also hold FTRs. According to PJM and the Commission, such participants may have an incentive to make virtual trades they otherwise would not make in order to affect congestion and thereby benefit an FTR position. *See PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,079, at ¶ 2 (Jan. 31, 2022) ("Compliance Order").

To counter potential manipulation, PJM added the FTR Forfeiture Rule to its tariff filed with the Commission in 2000. *Id.* The Rule is intended to deter manipulative conduct by preventing virtual traders from "creat[ing] congestion that benefits their related FTR positions." *PJM Interconnection, L.L.C.*, 158 FERC ¶ 61,038, at ¶ 25 (Jan. 19, 2017). As initially adopted, the Rule required an FTR holder to forfeit the profits from its rights when it submitted a related virtual transaction resulting in higher day-ahead prices than real-time prices for that transmission path. *Id.* Petitioners XO Energy MA, LP and XO Energy LLC (together, "XO Energy") participate in the PJM energy markets affected by the Rule.

**B.**

In 2013, PJM filed tariff revisions expanding the definition of virtual transactions to include "Up-to Congestion" transactions, and the Commission launched a Section 206 investigation of the Rule's application. In a 2017 order, the Commission determined that PJM's "application of its FTR Forfeiture Rule to virtual transactions [was] no longer just and reasonable," and directed PJM to issue a compliance filing in accordance with the Commission's findings. *Id.* ¶¶ 2, 4 ("2017 Order"); Compliance Order ¶ 3; *see also* 16 U.S.C. § 824d(a).

In April 2017, PJM proposed a new Forfeiture Rule (the "2017 Proposed Rule"), which it began applying retroactively to January 2017. *PJM Interconnection, L.L.C.*, 175 FERC ¶ 61,137, at ¶ 109 (May 20, 2021) ("2021 Order"). Under the 2017 Proposed Rule, forfeiture would be triggered when the trader's virtual transaction (1) had an "appreciable impact," which in most circumstances would mean it increased congestion by more than 10%, and (2) increased the value of the trader's FTR by one cent or more. *Id.* ¶ 18.

XO Energy filed a Section 206 complaint against PJM in April 2020, arguing that the Forfeiture Rule was unjust and unreasonable because it captured competitive market conduct and "could not detect financial leverage or assess intent to profit from illegitimate trading activity." 2021 Order ¶ 2; *see* 16 U.S.C. § 825e. It sought refunds of FTR forfeitures dating back to the implementation of the 2017 Proposed Rule. In May 2021, the Commission determined that certain aspects of the 2017 Proposed Rule were not just and reasonable. 2021 Order ¶¶ 27, 35. It found that the one-cent trigger threshold would penalize transactions with only "*de minimis*, incidental effects" on FTR values, and ordered PJM to "strike[] a more appropriate balance between deterring manipulative behavior and not burdening legitimate hedging activity." *Id.* ¶¶ 51, 27. It also ordered PJM to report on the feasibility of ordering refunds for the period during which the 2017 Proposed Rule had been in effect. *Id.* ¶ 111.

PJM thereafter proposed a new Forfeiture Rule in July 2021 (the "2021 Rule"), which was also challenged by market participants, including XO Energy. Compliance Order ¶ 1; Pet'rs' Br. 15. The Commission approved PJM's revised compliance filing in the orders challenged here, finding that the 2021 Rule was just and reasonable. Compliance Order ¶ 1; *PJM Interconnection, L.L.C.*, 179 FERC ¶ 61,010, at ¶¶ 1–2

(May 5, 2022) ("Reh'g Order"). It declined to order refunds for losses incurred due to PJM's implementation of the unapproved interim Rule, despite finding that rate unlawful. 2021 Order ¶¶ 110–11. It also rejected two other protests from XO Energy: that PJM should be required to evaluate the net financial effect on an FTR holder's portfolio, and to exempt non-leveraged positions from the Rule because they provide no economic incentive to engage in manipulative conduct. Compliance Order ¶ 43; Reh'g Order ¶¶ 10, 19; *see also* 2021 Order ¶ 76. XO Energy petitions for review of the Commission's orders denying refunds and approving the 2021 Rule. PJM's Independent Market Monitor intervened on behalf of the Commission.

## II.

The scope of this court's review is limited. It will reverse Commission action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1102 (D.C. Cir. 2019). "[G]reat deference" is accorded to the Commission's expertise under this standard, and the court "may not substitute [its] own judgment for that of the Commission," particularly in "technical area[s] like electricity rate design." *Elec. Power Supply Ass'n*, 577 U.S. at 292. "[I]n rate-related matters, the court's review of the Commission's determinations is particularly deferential because such matters are either fairly technical or involve policy judgments that lie at the core of the regulatory mission." *Ameren Ill. Co. v. FERC*, 58 F.4th 501, 505 (D.C. Cir. 2023) (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54–55 (D.C. Cir. 2014) (internal quotation marks omitted)). In fashioning remedies, the Commission's discretion is at its "zenith." *See Sacramento Mun. Util. Dist.*, 616 F.3d at 541 (quoting *Towns of Concord*, 955 F.2d at 76).

8

**A.**

XO Energy's challenge to the Commission's denial of refunds to market participants that incurred forfeitures under the 2017 Proposed Rule is ultimately unpersuasive. XO Energy maintains that the Commission lacked discretion not to order refunds and therefore erred as a matter of law in denying them here. Pet'rs' Br. 21–26. But that argument is contrary to settled law. The Commission has broad discretion to determine remedies for violations of the statutes it administers, *see, e.g.*, *Towns of Concord*, 955 F.2d at 72–76, and that discretion extends to denying refunds, *see Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804, 812 (D.C. Cir. 2007). In *Towns of Concord*, this court explained that "examination of the Federal Power Act reveals no statutory command mandating refunds when the rate charged exceeds that filed," 955 F.2d at 72, and that Section 309 affords the Commission general remedial discretion to effectuate each provision of the Act, including Sections 205 and 206, *id.* at 71–73 (citing 16 U.S.C. § 825h). The use of "may" in each of these provisions indicates that the Commission has the authority, but not the obligation, to provide a remedy for a statutory violation, including a filed-rate violation. *See id.* at 72–73 (citing 16 U.S.C. § 824d(e) and 16 U.S.C. § 824e(b)); *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016); *see also* Compliance Order ¶ 57 & n.101; Reh'g Order ¶ 14 & n.33.

XO Energy persists that, even assuming the Commission has such discretion, its stated justifications for refusing to order a refund are arbitrary. Specifically, it maintains the Commission erred in invoking the difficulty of calculating refunds as a rationale; in considering the passage of time as a reason to deny relief; and in stating that any repayments would need to be limited to amounts in excess of the Pre-2017 Rate, which was itself unlawful. Pet'rs' Br. 27–35. But "[a] court

is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Elec. Power Supply Ass'n*, 577 U.S. at 292. Rather, the court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see also Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 174 (D.C. Cir. 2022).

The Commission adequately justified its decision not to order refunds. It considered record evidence submitted by PJM, which explained that calculating refunds would be a difficult task requiring "considerable software development and testing work that would take months to complete." Reh'g Order ¶ 14. Without that software development, PJM would not be able to determine whether and when a given market participant would have violated the Pre-2017 Rule. *See* Compliance Order ¶ 15; *see also* PJM Interconnection, L.L.C., *FTR Forfeiture Rule Compliance Filing* 13–14, FERC Docket No. ER17-1433-003 (July 19, 2021) ("2021 Compliance Filing"). Undertaking this process would be unavoidable, the Commission explained, because the Pre-2017 Rule used an entirely different software code that PJM had not maintained. *See* Compliance Order ¶¶ 15, 59. The Commission recognized, moreover, that "[t]hese efforts would come at considerable expense, which would presumably be passed on to transmission ratepayers." *Id.* ¶ 59.

Further, the Commission explained that changes to market participants' ownership and structure during the four-and-a-half-year period in which the interim Rule was in effect would render it difficult to ensure that the correct parties received refunds, which would lessen the refunds' remedial value. *Id.* The issuance of refunds would depend on "what reasonable

assumptions to make about" market participant behavior, which would involve extensive discretionary judgment and implicate the accuracy of resulting refunds. 2021 Compliance Filing 14; Compliance Order ¶ 59 & n.103. It also pointed to the reasonable reliance interest of market participants, which "weigh[ed] against granting refunds in this case" because market participants likely adjusted their behavior to avoid forfeiture under the 2017 Proposed Rule when those same actions may have resulted in forfeiture under the Pre-2017 Rule. Compliance Order ¶ 61. The Commission therefore acted within a "zone of reasonableness" and "reasonably explained [its] decision" not to issue refunds to the affected traders. *Prometheus Radio Project*, 141 S. Ct. at 1158. And although the Commission had determined that the Pre-2017 Rate was no longer just and reasonable, that rate remained the effective rate on file during the interim Rule period, and so the Commission did not abuse its discretion in stating that any refund issued would be limited to charges in excess of those covered under the Pre-2017 Rate. Reh'g Order ¶¶ 16–18; *see Sacramento Mun. Util. Dist.*, 616 F.3d at 541.

## B.

XO Energy challenges the 2021 Rule as overbroad, contending that it burdens legitimate hedging activity in the course of deterring potentially manipulative transactions. Compliance Order ¶¶ 108–10. It maintains that the 2021 Rule fails to account for market participants' entire portfolios and punishes non-leveraged sets of transactions, which XO Energy contends cannot possibly be manipulative. Pet'rs' Br. 35–41.

PJM's Independent Market Monitor, as intervenor, argues that neither of these arguments are within the proper scope of the appeal because the orders on review "do not revisit the findings of the 2021 Order" on the portfolio and leverage issues

previously rejected by the Commission. Intervenor Br. 1–3. But the 2021 Order was conditioned on a future compliance filing by PJM. *See* 2021 Order ¶¶ 108, 111. And regardless, the orders on review affirmed the Commission's previous findings on the portfolio and leverage issues, and in so doing permitted XO Energy to challenge the Commission's approval of the 2021 Rule on those grounds. Compliance Order ¶ 43; Reh'g Order ¶¶ 10, 19; *cf. Pub. Citizen v. Nuclear Regul. Comm'n*, 901 F.2d 147, 150–52 (D.C. Cir. 1990).

**1.**

XO Energy contends that the Commission abused its discretion by failing to instruct PJM to consider the entirety of market participants' FTR portfolios in its revised Rule. It maintains that this requirement might reveal that the trader has other FTR positions that resulted in no overall profit. *See* 2021 Order ¶ 76; Compliance Order ¶ 43; Reh'g Order ¶ 19. The Commission explained, however, that PJM focused its Rule on virtual transactions impacting particular FTRs and not on the net effect to FTR portfolios, because it is virtual transactions that facilitate manipulative conduct by affecting congestion on the grid. 2021 Order ¶ 76. FTRs themselves "have no impact on the dispatch or energy flow on the system either individually or cumulatively," and furthermore, consideration of an entire FTR portfolio "would create opportunities to mask the manipulation of individual FTRs." *Id.* The Commission also endorsed the analysis of PJM's Independent Market Monitor, finding that a portfolio rule "would result in discriminatory treatment" of particular FTR paths "based on whether or not they were part of a portfolio." 2021 Order ¶ 75.

The Commission recognized in the 2017 Order that considering a trader's entire virtual transaction portfolio was necessary to "accurately reflect the net impact of a market

participant's overall portfolio of virtual transactions on a constraint related to an FTR position." 2017 Order ¶ 57. But it explained in its 2021 Order that the same is not true of entire FTR portfolios, because whether a trader is making a net profit from its total FTRs has no bearing on whether its virtual transactions are causing or alleviating congestion in a manner benefiting a particular FTR. *See* 2021 Order ¶ 76; Compliance Order ¶ 45; Reh'g Order ¶ 19. XO Energy shows no error. Because the Rule's objective was to deter manipulation in the form of targeted virtual transactions that would affect grid congestion and benefit particular FTRs, it was not unreasonable for the Commission to omit a requirement for PJM to take traders' entire FTR portfolios into account in addition to their virtual transaction portfolios.

**2.**

Still, XO Energy contends that the Commission erred when it failed to require PJM to exempt non-leveraged positions from the 2021 Rule, because they provide no economic incentive to engage in manipulative conduct. Pet'rs' Br. 40–41. If a trader's FTR gains exceed the losses incurred from that trader's virtual transactions, that trading position is, according to XO Energy, "leveraged." If losses from virtual transactions exceed the trader's gains from FTRs, the trade is not "leveraged." *See* 2017 Order ¶ 74 n.60. In XO Energy's view, the required balance between preventing manipulative conduct and not burdening legitimate hedging activity can be achieved only if non-leveraged positions are exempted from the 2021 Rule. Pet'rs' Br. 40–41. Essentially, XO Energy maintains that "leverage" is a necessary condition to market manipulation, and the Commission erred in not requiring PJM to consider it.

The arbitrary and capricious standard requires that an agency's decision be both "reasonable and reasonably explained." *Nw. Corp. v. FERC*, 884 F.3d 1176, 1181 (D.C. Cir. 2018). The Commission offers a brief, but inadequate, explanation of why it declined to order a forfeiture exemption for non-leveraged transactions. Compliance Order ¶ 43; Reh'g Order ¶¶ 10, 19; *see also* 2017 Order ¶ 80. Although the Commission acknowledges that leverage might be one way to determine cross-product manipulation, it states that it opted to allow PJM to employ other means to detect this conduct rather than require exemptions based on leverage. 2017 Order ¶ 80; *see also* Compliance Order ¶¶ 43, 48; Reh'g Order ¶ 19. That is the extent of the Commission's explanation. It does not address XO Energy's position that market manipulation cannot occur when the net losses of a trader's virtual transaction portfolio exceed the net profits from its FTR portfolio. Nor does it explain why the exclusion of this requirement strikes the appropriate balance between preventing manipulative conduct and not hindering legitimate hedging activity. Absent such explanation of its decision, the Commission's failure to order a leverage exemption appears arbitrary and capricious.

Vacatur of the 2021 Rule is, nonetheless, not appropriate here. Although "vacatur is the normal remedy" for an unlawful agency decision, *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), this court employs a two-factor test to determine whether vacatur is appropriate: (1) "the likelihood that 'deficiencies' in an order can be redressed on remand"; and (2) "the 'disruptive consequences' of vacatur." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993)). Both factors weigh against vacatur. On remand, the Commission can redress the deficiency of its reasoning by providing a more fulsome explanation for its decision not to order PJM to

account for leverage. Given "a significant possibility that the Commission may find an adequate explanation for its actions" on remand, vacatur is less proper. *See Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008). Vacatur of the order approving the 2021 Rule would unduly disrupt PJM's markets as well. Because market participants have relied on the Commission's approval of the 2021 Rule, preservation of the status quo is appropriate pending the Commission's further explanation of its reasoning.

Accordingly, the court grants the petition in part and denies it in part. The court affirms the Commission's denial of refunds and remands without vacating the 2021 Rule for further explanation of the Commission's decision to exclude consideration of leverage as a required element of the Rule.